

Jaime Brown
*Legal Intern*
Colin Prince
*Chief Appellate Attorney*
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606

# United States District Court
## Honorable Wm. Fremming Nielsen

| | |
|---|---|
| United States, | No. 2:21-cr-0001-WFN-1 |
| Plaintiff, | Motion to Modify Pretrial Release Conditions (Opposed) |
| v. | |
| Peter James Yeager, | |
| Defendant. | July 8, 2022 at 6:30 p.m. Oral Argument Requested |

## I.   INTRODUCTION

Peter Yeager respectfully moves to modify his pretrial release conditions—specifically, to discharge Special Condition 28 (GPS monitoring and home detention) as no longer necessary to reasonably assure Mr. Yeager's continued appearance and public safety. In the alternative, Mr. Yeager requests that Special Condition 28 be modified to simply require him to abide by a curfew, with curfew hours to be set by Probation to accommodate Mr. Yeager's work and school schedule.

## II.   BACKGROUND

On January 5, 2021, a grand jury indicted Mr. Yeager for an alleged violation of 18 U.S.C. § 844(i). The gist of the charge is that Mr. Yeager walked into the Democratic party headquarters in Spokane, told people he wanted to hurt no one but had a bomb (he didn't), and asked that staff disseminate a "manifesto" he had written. After the tenants and staff evacuated the building, Mr. Yeager used gasoline to start a fire in a corner of the office. After the incident, multiple witnesses stated it was apparent Mr. Yeager was suffering severe mental illness during the episode.

Mr. Yeager was arrested on December 9, 2020, federally arraigned on January 12, 2021, and initially detained,[1] although he was later released on May 4, 2021.[2] Mr. Yeager was originally represented by Steven Hormel. After a conflict, the Court appointed the Federal Defenders to represent Mr. Yeager in mid-December 2021.

Since release, the Court has modified his conditions numerous times, recognizing that Mr. Yeager has a perfect pretrial record. Most notably, he was twice allowed to transfer supervision to other districts, first to Idaho on July 19, 2021,[3] then to the Southern District of California on January 7, 2022.[4] As part of his transfer to Idaho, Special Condition 11 (that Mr. Yeager's mother would act as his third party custodian) was stricken.[5] The Court also permitted Mr. Yeager to make a two-day trip to the Western District of Washington for psychiatric testing shortly after his initial release.[6] The Court has also considered and denied two motions to modify pretrial release conditions (to permit two hours of outdoor exercise per day[7] and to remove the

---

[1] ECF No. 13 (Minutes of Initial Appearance/Arraignment); ECF No. 14 (Order Granting Motion for Detention).

[2] ECF No. 31 (Order Following Detention Review Hearing).

[3] ECF No. 42 (Order Granting Defendant's Motion).

[4] ECF No. 70 (Order Granting Defendant's Motions).

[5] ECF No. 42 (Order Granting Defendant's Motion).

[6] ECF Nos. 35 (Motion to Modify Release Conditions), 38 (Order Granting Motion).

[7] ECF No. 37 (Order Denying Motion).

GPS monitoring component of Special Condition 28[8]) filed last year during Mr. Hormel's tenure.

Mr. Yeager has kept busy over his 13 months on pretrial release. He enrolled at North Idaho College to finish the two semesters' worth of credits he needed to complete his associate's degree, attending remotely from California during spring semester and earning an impressive overall GPA of 3.86.[9] Seeking more technical skills, he enrolled in an automotive-technician course at the San Diego College of Continuing Education. He completed part one of this course in early June and is now working to transfer to the biomedical-equipment-technician program at Mira Costa College. The Mira Costa application required passing an entrance exam and interviewing with the program director. He recently received his acceptance letter and will begin these classes on August 1st.

Now that Mr. Yeager has moved to Southern California and lives near both parents, he has also assumed familial duties. He lives with his mother in Vista, California, and he helps out with yardwork and contributes to household expenses. His mother is healthy and active for her age (78) but has had some health scares in the past, including severe injuries from a fall in 2020. She anticipates needing surgery for a

[8] ECF No. 67 (Order Denying Motion).

[9] Exhibit A (North Idaho College Transcript and Diploma).

cervical disc in the near future at which point Mr. Yeager will need to take on more care and household responsibilities.

Meanwhile, his 80-year-old father, Errol Yeager, continues a long battle with lung cancer. Errol has a home health caregiver to handle things like meals and hygiene but still needs help with errands and maintaining his three-acre horse ranch in Poway. With Probation's permission, Mr. Yeager began working for his father on April 1st—about 11 hours per day on Fridays, Saturdays, and Sundays. His ranch work includes duties like animal care, tractor repair, and remodeling an outbuilding into an apartment residence. He helps Errol personally in any way needed. For example, Errol still has a driver's license and would drive himself, but Mr. Yeager volunteers to drive out of concern that Errol's health conditions would pose a safety risk. He runs other errands, like picking up Errol's prescriptions. Besides that, simply spending time together is important. Given his health and age, Errol's personality can be difficult and has even led to conflicts with the caregiver. Mr. Yeager jokes that he is the "relief pitcher" when the caregiver needs a break; he's accustomed to his father's bluster and wants to make sure Errol has company.

Mr. Yeager has consistently complied with his pretrial release conditions. He worked with Probation Officer Allie Zekan to get preapproval for school and family matters. He has incurred no pretrial violations to date.

# III. Discussion

## A. The home detention and GPS conditions have become onerous for Mr. Yeager and unnecessary.

Mr. Yeager is zealous about his compliance and has established a perfect track record—if the Court checks the docket, it will see not one pretrial-violation petition filed. That perfect record warrants reducing Mr. Yeager's conditions from home detention to a simple curfew—a level of restriction that Mr. Yeager has previously handled successfully while living in Idaho. In short, now that Mr. Yeager has been living without issue for months in Southern California, it is time to reduce his restrictions.

That modification merely reflects the good behavior noted by probation officers in both Washington and Idaho. When he was supervised in this district, Probation Officer Phil Casey described Mr. Yeager as "*overly* compliant." His Idaho Probation Officer, Rebecca Thompson, noted having zero issues with him—his transfer to Idaho was seamless, and Officer Thompson eventually placed Mr. Yeager on a simple curfew, which caused no problems.

His transfer to California was similarly routine. But the defense would like to highlight a number of scheduling hiccups simply to (1) show the Court how well Mr. Yeager deals with Probation; and (2) explain why the current level of restriction is onerous.

In late April, Mr. Yeager started in-person classes, in addition to weekend work for his father, and the combination led to a more complicated daily schedule. He has since had three instances where GPS monitoring and his detention restrictions have caused issues (although none were violations).

*First,* on May 5, 2022, Mr. Yeager received an unexpected call from Probation. Ms. Zekan was out of office, and a substitute officer was covering. The substitute officer asked Mr. Yeager about his lunch break the day before. He'd forgotten to pack a meal for school and had eaten at a nearby taco shop instead, spending about 20 minutes. The substitute officer said she only allowed her supervisees 15 minutes to get take-out meals, never to dine in. (Probation had never given Mr. Yeager such an instruction before.) She notified him she'd be reporting this incident to Ms. Zekan.

*Second,* on May 10th, Ms. Zekan called Mr. Yeager upon her return to the office. She had questions about another report, this time involving a lunch break on May 7th. Mr. Yeager had been out working at his dad's place; his dad wanted to go to lunch, so Mr. Yeager drove him to a pizza place 15 minutes away. They ate over the course of 45 minutes and returned to the ranch. While Mr. Yeager's preapproved duties to his father on weekends included transportation (presumably to and from lunch), Mr. Yeager assured Ms. Zekan that if taking Errol to lunch was an issue, he wouldn't do it anymore. He also explained the previous lunch break incident—that

the substitute officer's expectations surprised him, but that he wouldn't go out for lunch at school again if it was an issue. Ms. Zekan said she'd relay everything to Probation for the Eastern District of Washington.

*Finally*, Mr. Yeager most recently heard from Probation about his movements on June 14th. That afternoon, he'd set out to begin part two of the automotive-technician program. As he drove, he mulled over his upcoming school schedule with excitement, having recently learned he'd passed the entrance exam for Mira Costa College's biomedical-tech program. If the interview went well, he'd start that program on August 1st. There would be a few days of overlap between his automotive-tech classes and the biomedical-tech program. He'd planned to stay the course with his automotive-tech program in case the biomedical-tech program didn't accept him. But now that the biomedical-tech program was in reach, he realized the overlap could pose a serious problem.

Mr. Yeager depends on G.I. Bill funding for his tuition. His nontraditional academic path, however, has already caused snags in that funding. In early June, his coverage for the San Diego Continuing-Ed tuition was interrupted for administrative reasons—he didn't fully understand the V.A.'s explanation why, but he surmised it was due to the unusual dates of his automotive tech program (late April to early June),

1  or perhaps because his North Idaho College and San Diego coursework overlapped by

2  a few months. But he cannot afford shortfalls in tuition funding.

3      At any rate, Mr. Yeager began to worry that committing to his San Diego

4  Continuing-Ed course would cause another shortfall. The Mira Costa program is by

5  far his first choice. But if he attended the first day of his automotive-tech course, he'd

6  be on the hook for tuition in San Diego, even if he forfeited the credits by transferring

7  to Mira Costa. He decided to turn around and drop the automotive-tech class. On his

8  way home, he stopped briefly for groceries and toothpaste since he was already

9  preapproved to be out for several hours of classes. The next day, Ms. Zekan called

10  him; he explained everything, and she admonished him to notify her of schedule

11  changes. Ms. Zekan did not mention taking any further action.

12      Rightly recognizing these are the most minor of hiccups, Probation has never

13  filed a petition alleging violations. But these hiccups demonstrate just how reliable Mr.

14  Yeager is: he communicates openly with his Probation officers and quickly remedies

15  even minor misunderstandings.

16      These hiccups also show why home detention has become onerous. Mr. Yeager

17  is engaged in school and family responsibilities that necessitate some level of

18  flexibility—and that is the level of flexibility allowed by a curfew, not home detention.

19

Most importantly, Mr. Yeager was *already* placed under a curfew while living in Idaho and has demonstrated he can abide by it. Indeed, Idaho Probation expressed that Mr. Yeager should not be under GPS monitoring of any kind.[10]

## B.    The home-detention and GPS conditions are more restrictive than necessary.

When fashioning conditions of pretrial release, the Bail Reform Act requires courts to impose the "*least* restrictive further condition, or combination of conditions, that . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B) (emphasis added). Courts are permitted to "at any time amend the order to impose additional or different conditions of release," including discharge of unnecessary conditions. 18 U.S.C. § 3142(c)(3).

Courts routinely recognize that extended good behavior on pretrial release may justify reducing restrictions. For example, in *United States v. Hutchins*, 298 F. Supp. 3d 1205 (E.D. Wis. 2017), both the magistrate and the district court found it appropriate to discharge pretrial release conditions—twice—based solely on one thing: the defendant's compliance. The defendant was a British citizen facing various charges for

---

[10] ECF No. 65 (Motion to Modify) ("Mr. Yeager's current Probation officer [in Idaho] stated she has had zero issues with Mr. Yeager—in fact, she continues to believe his current GPS-monitoring [condition is] unwarranted.").

using a malware program to steal personal information. *Id.* at 1206. The court allowed him pretrial release to reside in Los Angeles under conditions of home detention and GPS monitoring. *Id.* Ten days later, the magistrate converted the home detention condition to a curfew; when the government sought review, the district court affirmed, finding that "Hutchins' home confinement was essentially punitive" in light of his compliance. *Id.* Less than two months later, the magistrate discharged the curfew and GPS monitoring conditions altogether, a decision the district court upheld over government opposition. *Id.* at 1206-07, 1210. Both courts rejected the government's argument that mere compliance was insufficient grounds to reduce restrictions, noting that the government's speculation as to possible flight wasn't a "cogent argument" showing why the curfew and GPS conditions remained necessary. *Id.* at 1208-09. "While eliminating curfew and GPS monitoring will undoubtedly reduce the level of scrutiny given to Hutchins' movements, the government has not satisfactorily explained why these factors require such conditions." *Id.* at 1209. Indeed, the defendant had already spent nearly a month without the curfew or GPS monitor in the interim between the magistrate's decision and the district court's review; "[n]evertheless, he has not attempted to flee." *Id.* at 1207.

Both the magistrate and district court based their decisions solely on the defendant's record of compliance. *Id.* at 1206-10. Pretrial services acknowledged that

"such reductions [are] ***commonplace*** after a defendant has shown compliance with release conditions." *Id.* at 1206 (emphasis added). The district court went further, reasoning it was obligated to reduce restrictions: reduction was "consistent with the Court's ongoing obligation under Section 3142(c) to ensure that only the least restrictive conditions necessary to reasonably assure Hutchins'[s] appearance are employed." *Id.* at 1209.

Mr. Yeager has a significantly stronger record of compliance than the record that "obligated" the court to reduce restrictions in *Hutchins*. The *Hutchins* courts found 10 days of compliance sufficient to substitute a curfew for home detention, and 50 days sufficient to remove the curfew and GPS monitoring entirely. *See id.* at 1206-07. As of July 6, 2022, Mr. Yeager has notched 428 days of compliance—and across three separate districts. Further, Officer Thompson has already tested Mr. Yeager's compliance with a basic curfew. As in *Hutchins*, the Government cannot plausibly argue that stringent location monitoring is necessary to ensure Mr. Yeager's appearance when he has ***already*** demonstrated he poses no greater flight or safety risks under lesser scrutiny. *See id.* at 1207. Maintaining these conditions would be "essentially punitive," as in *Hutchins*, and inconsistent with the Court's "ongoing obligations" to impose the least restrictive conditions necessary to reasonably assure Mr. Yeager's appearance and community safety. *See id.* at 1206, 1209.

**C.  Many new reasons supporting this motion have emerged since the Court last considered this issue.**

When this Court last considered Special Condition 28, Mr. Yeager's motion was based on (1) the cost of electronic monitoring and (2) embarrassment from wearing the monitoring device.[11]

In addition to those two reasons, several more arise here:

(3)  Mr. Yeager's now 14-month history of compliance with all pretrial release conditions;

(4)  The positive reports from Probation Officers Phil Casey and Rebecca Thompson regarding Mr. Yeager's performance on supervision;[12]

(5)  Mr. Yeager's consistent behavior across two inter-district transfers of supervision;

(6)  Mr. Yeager's close family ties (and family obligations) in southern California;

(7)  Mr. Yeager's dependence on veterans' assistance programs for healthcare and education funding;

(8)  Mr. Yeager's commitments to completing his academic programming in support of his future career;

---

[11] ECF No. 67 (Order Denying Motion).

[12] ECF No. 65 (Motion to Modify) ("[H]is first Probation officer, Phil Casey, told the defense that Mr. Yeager was 'overly compliant,' calling nearly every day. . . . Mr. Yeager's current Probation officer [in Idaho] stated she has had zero issues with Mr. Yeager—in fact, she continues to believe his current GPS-monitoring [condition is] unwarranted.").

(9)   The long process Mr. Yeager has undergone to set up counseling appointments through the VA;

(10)  Mr. Yeager's ongoing commitments to sobriety and abiding by the law; and

(11)  The waste of Probation's finite resources in monitoring Mr. Yeager's daily routine, when the only notable incidents have concerned lunch breaks and grocery trips.

**D.    No new reasons for denying this motion have emerged since the Court last considered this issue.**

When this Court last considered Special Condition 28, neither Probation Officer Linda Leavitt nor the Government opposed discharging the GPS monitoring condition.[13] When contacted about the instant motion, Officers Leavitt and Zekan stated they would again defer to the Court and the Government. However, the Government has indicated that it now opposes removing the GPS condition.

It is unclear why the Government has changed its stance. Its only explanation to defense counsel was that "Mr. Yeager has been charged with a very serious crime, and there is an important need to monitor his whereabouts." That statement was just as true, if not more true, at the December 2021 hearing, when the Government did not oppose Mr. Yeager's prior request. That statement was just as true, if not more true,

---

[13] ECF No. 64 (Minutes of Status Hearing, Dec. 15, 2021) ("Government left modification to the discretion of the Court. U.S. Probation is not opposed to the modification.")

when Mr. Yeager was originally granted pretrial release in March 2021. The Court

should not give much weight to the Government's change of position when its new

position relies on the exact same facts that have been before the Court for months. *See*

*Christoffel v. U.S.*, 196 F.2d 560, 567 (D.C. Cir. 1951) (refusing the government's

request to revoke bail or add new conditions, because the factual basis for that request

contained no new facts suggesting an increased flight risk). And that statement—that

Mr. Yeager is charged with a "serious crime"—is true of virtually everyone charged

in federal court. Yet Congress intended the Bail Reform Act to ensure most

defendants were released. *See U.S. v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991) (only

in "***rare*** circumstances should release be denied," and any "doubts regarding the

propriety of release should be resolved in the defendant's favor") (emphasis added

and citations omitted). The Bail Reform Act itself counsels that the mere allegations in

the indictment should be given the least weight. *See U.S. v. Motamedi*, 767 F.2d 1403,

1409 (9th Cir. 1985) (because the defendant has had no chance to investigate the

Government's claims and is presumed innocent, the court must discount "weight of

the evidence" as the "the least important of the various factors"). Here, the

Government can only point to its charge—it has nothing else. When it comes to

detention, Mr. Yeager's perfect track record across the three districts, lack of

significant criminal history, family ties, and engagement in school and other activities more than warrants modification.

**E.      In the alternative, Mr. Yeager requests substitution of a simple curfew.**

If the Court does not discharge Special Condition 28 wholesale, Mr. Yeager requests in the alternative that Special Condition 28 be replaced with the following substitute condition:

**(28) CURFEW:** The Defendant shall be restricted to his residence between certain specified curfew hours. U.S. Probation shall determine the specific curfew hours based on the Defendant's schedule of employment, academic, and household/personal activities, including travel time to and from these activities. U.S. Probation may modify the specific curfew hours as needed to accommodate changes in the Defendant's schedule.

## IV.   Conclusion

For the reasons stated above, Mr. Yeager respectfully requests the Court modify his pretrial release conditions to remove Special Condition 28 entirely or replace it with a basic curfew.

1    Dated: July 6, 2022.

                                    Federal Defenders of Eastern Washington & Idaho
2                                   Attorneys for Mr. Yeager

3                                   s/Colin G. Prince
                                    Colin G. Prince, WSBA No. 43166
4                                   s/Jaime Brown
                                    Legal Extern
5                                   10 North Post Street, Suite 700
                                    Spokane, Washington 99201
6                                   t: (509) 624-7606
                                    Colin_Prince@fd.org

7

8

9

10

11

12

13

14

15

16

17

18

19

## Service Certificate

I certify that on July 6 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will notify Assistant United States Attorney Dominique Juliet Park.

<u>s/Colin G. Prince</u>
Colin G. Prince, WSBA No. 43166
10 North Post Street, Suite 700
Spokane, Washington 99201
t: (509) 624-7606
f: (509) 747-3539
Colin_Prince@fd.org